Rodríguez García, Juez Ponente
*859 TEXTO COMPLETO DE LA SENTENCIA
Myma Cabrera Soto (Cabrera) comparece ante nos con el interés de que se revise y revoque una resolución emitida por el Honorable Tribunal de Primera de Instancia, Sala Superior de Caguas, en 6 de abril de 2002. Mediante la misma, el foro apelado resolvió otorgar la custodia permanente del hijo menor habido entre las partes al padre de éste, el aquí apelado, Reinier Espéndez Sosa (Espéndez).
Por los fundamentos que se expondrán a continuación, se confirma la sentencia apelada.
Trasfondo Fáctico y Procesal
Para el 11 de agosto de 1993, las partes presentaron una Petición de Divorcio por la causal de consentimiento mutuo, en la que se estableció mediante estipulación que la custodia y la patria potestad sobre el menor habido en el matrimonio, quien al momento contaba con un año y ocho meses de edad, sería ejercida por la Sra. Cabrera; se fijó una pensión alimentaria de doscientos dólares ($200.00) mensuales; y que las relaciones patemo-fihales serían abiertas, previo acuerdo con la madre del menor en la residencia de la abuela materna por espacio de dos horas. El divorcio fue decretado mediante sentencia de 27 de agosto de 1993.
En 18 de enero de 1994, Espéndez, quien residía y reside en el estado de Florida, solicitó el señalamiento de una vista con el fin de "terminar" la situación en cuanto a las relaciones paterno-filiales. A los efectos, el Tribunal ordenó que "las partes con sus abogados estructuraran el plan que acordaron y expresaron respecto a la relaciónpatemo-filial." (Alegato parte apelada, Apéndice 4).
Posteriormente, en 8 de junio de 1994, el apelado solicitó la intervención urgente del Tribunal debido a que no veía a su hijo hacía más de un año. El Tribunal refirió el asunto a la Oficina de Relaciones de Familia del Tribunal (ORF).
Según surge de la resolución apelada, la ORF había citado a las partes para una evaluación, y a pesar de haber sido citada por la Unidad de Alguaciles del Tribunal, Cabrera no compareció. A los efectos, el Tribunal citó mediante orden de mostrar causa a la Sra. Cabrera, para vista de desacato a celebrarse en 21 de diciembre de 1994. En dicha fecha, el Tribunal ordenó a Cabrera a acudir esa misma tarde a ORF.
Realizada la evaluación pertinente, en 24 de febrero de 1995, la Trabajadora Social de la ORF, Nélida Rosado Rodríguez presentó moción informativa, en la que expone sobre lo ocurrido en la evaluación. A los efectos, expuso, entre otras cosas, lo siguiente:

“La dinámica observada fue la siguiente: Se levantó con el niño en sus brazos y lo puso en el piso cerca de la silla donde estaba el padre del menor. Observamos que el niño se desorientó, comenzó a mirar para todos lados. Inmediatamente, la madre lo tomó en brazos.

La señora Cabrera continuó alterada y hablando de diferentes temas. Ante la presencia del padre, más se alteraba la señora Cabrera. Insistía en no entregarle el niño a su padre.

A todo esto, el menor permanecía callado y observador en los brazos de la madre.

Al transcurrir el tiempo y en ausencia del padre, permitió que el menor saliera de su regazo. Ante el estímulo de los presentes, el niño se mostró accesible y se pudo hablar con él. El Alguacil López intentó sacar el niño de nuestra oficina. La madre se violentó e intentó agredirlo, lo cual impidió la Leda. Lebrón, representante legal de la señora Cabrera.

*860
La madre se mantuvo renuente a permitir la relación padre-hijo. No aceptó la intervención de nuestra sicóloga. Manifestó que por su hijo se cortaría las manos. En entrevista anterior había expresado que estaba dispuesta a morir.

En su desesperación, le pedía que la dejaran tranquila con su hijo. Acusaba a su ex-esposo de irresponsable y agresor. Según dijo, es víctima de hostigamiento de su ex-esposo y el sistema.

La señora Cabrera fue ampliamente orientada por todos los presentes de las consecuencias emocionales en el niño y legales para ella debido a su comportamiento. A las 4:00 p.m. se dio por concluida nuestra intervención.

Tenemos ante nuestra consideración una situación sumamente delicada. La Sra. Cabrera no es orientable. Consideramos que la seguridad del menor se encuentra en riesgo.” (Alegato Parte Apelada, Apéndice 5)
Luego de varios trámites procesales, en la vista de seguimiento de 28 de febrero de 1995, el Tribunal de Primera Instancia fijó las relaciones patemo-filiales todos los sábados de 9:00 a.m. a 5:00 p.m., bajo serio apercibimiento de desacato en caso de incumplimiento. Se prohibió sacar al niño de la jurisdicción de Puerto Rico ni de Caguas sin la autorización del Tribunal y ordenó que se continuaran las evaluaciones psicológicas. Además, el Tribunal autorizó a cualquier oficial de la Policía de Puerto Rico a ejecutar la orden si Cabrera se negaba a cumplir con las relaciones establecidas. En dicha vista, la abogada de Cabrera solicitó el relevo de la representación legal.
Tras incumplir en varias ocasiones con las órdenes del Tribunal, sin asistir a las citas siquiátricas, ni permitir las relaciones paterno-filiales, se señaló vista para el 5 de abril de 1995. En dicha vista, el Tribunal estableció el siguiente plan de relaciones patemo-filiales:

“Se va a establecer un plan de relación paterno-filial limitado por seis semanas; los sábados de 12:30 del medio día a 4:30 de la tarde dependiendo del escenario, si es Burger King o McDonald. Si es un sitio como el Parque Muñoz Marín, se extenderá por un poco más el horario. El plan comenzará el 8 de abril hasta el 13 de mayo de 1995. La abuela materna, señora Francisca Cabrera, acompañará al niño.

Después de las seis semanas, el propósito del Tribunal es que el padre se relacione sólo con el niño en el área de Caguas, en el hogar de sus padres. Este plan se llevará a cabo el 20 de mayo, 3 de junio y 17 de junio de 1995 de 9:00 de la mañana a 5:00 de la tarde.

La relación paterno-filial es bajo apercibimiento de desacato. ” (Alegato Parte Apelada, Apéndice 12)
En 10 de abril de 1995, Espéndez presentó Moción Informativa, en la que notifica al Tribunal lo siguiente:

“Que tan pronto la señora descendió del taxi, procedió a insultar, utilizando un lenguaje grosero y soez, contra el señor Reinier Espéndez sin percatarse de que el abogado suscribiente estaba cerca y escuchando todas sus palabras.

Que al percatarse de la presencia de este abogado, procedió a insultarlo del mismo modo que lo hizo con su ex-esposo y acto seguido penetró al negocio donde continuó insultando al señor Espéndez.

Que el abogado suscribiente entró al negocio con el propósito de explicarle a la señora Soto la conveniencia de que su hija abandonara el sitio y permitiera que las relaciones paterno-filiales continuaran tal y como había ordenado el Tribunal.

*861 Que la señora Francisca Soto, aunque no utilizó lenguaje grosero como lo hizo su hija, si se mostró hostil y el asunto concluyó cuando, ante la constante agresión verbal de la señora Cabrera, optamos por retirarnos del lugar acompañados por el último improperio de la señora Cabrera, que fue mandarnos al carajo.” (Alegato Parte Apelada, Apéndice 13)
En ese mismo día, 10 de abril de 1995, Cabrera solicitó una Orden de Protección en el Tribunal Municipal de Caguas contra Espéndez, la cual fue expedida ex-parte y no fue notificada a Espéndez hasta en 19 de abril.
En 24 de abril de 1995, Espéndez presentó una Moción con Carácter Urgente en la que notifica al Tribunal sobre la Orden de Protección solicitada por Cabrera en el Tribunal Municipal y además, notifica y solicita lo siguiente:

“Que la Sra. Myrna Cabrera Soto ha obstruido todos los intentos del Tribunal para reglamentar las relaciones paterno-filiales, no empece a que las órdenes del Tribunal han sido bajo apercibimiento de desacato.

Que el Sr. Reinier Espéndez Sosa ha sido cooperador y respetuoso durante todo este largo proceso, como pueden dar Fe, el Tribunal, los distintos jueces que han intervenido, tales como el Honorable Ramón Buitrago Iglesias, Honorable Víctor Rivera González y Honorable Rubén Torres Dávila y La Unidad de Trabajadoras, Alguaciles y demás funcionarios del Tribunal.

Que la conducta de la Sra. Myrna Cabrera Soto ha sido de total desprecio hacia las órdenes de este Tribunal y de una actitud grosera hacia el Sr. Reinier Espéndez Sosa y con este abogado que sólo cumple con el deber de representar adecuadamente a su cliente.

Que en mérito de lo antes expuesto, el Promovente solicita muy respetuosamente de este Honorable Tribunal que encuentre a la Sra. Myrna Cabrera Soto incursa en desacato y en su consecuencia ordene el arresto de ésta. Se solicita además que el menor hijo Andrés Espéndez Cabrera sea puesto bajo la custodia del Departamento de Servicios Sociales para que las relaciones paterno-filiales ordenadas por el Tribunal puedan seguir su curso. ”

En 26 de junio de 1995, el TPI dejó sin efecto la Orden Ex parte de Protección. Además, se citó a Cabrera, a través de su nuevo abogado, Ledo. José Luis Cotto, a comparecer ante el Tribunal a mostrar causa por la cual no deba ser declarada incursa en desacato por desobediencia obstinada con las órdenes del Tribunal y en consecuencia, imponer las sanciones correspondientes.
En 30 de junio de 1995, el Tribunal de Instancia celebró vista, en la que se resolvió:

“La prueba testifical y documental presentada, acredita que de nuevo la madre ha realizado gestiones conductivas a entorpecer e impedir, como de hecho ha logrado, que el padre promovente pueda establecer una relación paterno-filial con su pequeño hijo tal como fuera ordenado por este Tribunal y aun hasta acordado por la parte promovida. La conducta continua de la promovida no asegura que dará cumplimiento con las órdenes de este Tribunal.

De hecho, resolvemos que la demandante-promovida ha incurrido en abierto desacato a la orden de este Tribunal, a su propia voluntad y por actos dirigidos a esos propósitos a entorpecer la relación paterno-filial concedida por este Tribunal.” (Alegato Parte Apelante Apéndice 26)
Dos meses más tarde, en 31 de agosto de 1995, Espéndez y el abogado de Cabrera informan al Tribunal que desconocen el paradero de ésta, por lo que las relaciones paterno-filiales no se estaban llevando a cabo. Por su *862 parte, el representante legal de Cabrera solicitó la renuncia.
En 25 de octubre de 1995, el Tribunal ordenó el arresto de Cabrera y reseñaló el caso para el día 17 de noviembre de 1995. No obstante, a dicha vista no compareció Cabrera, por lo que se ordenó su arresto. Sin embargo, compareció el abuelo paterno del niño quien señaló desconocer el paradero de Cabrera y el niño. Ante dicha situación, el Tribunal ordenó que los pagos de pensión realizados por Espéndez fueran depositados y congelados hasta nuevo aviso.
Durante casi cinco años, no se supo del paradero de Cabrera ni del menor. Durante ese tiempo, Cabrera salió del país y se trasladó a la ciudad de Nueva York con su hijo y con su madre, con la intención de evadir las órdenes del foro de instancia con relación a las relaciones patemo-filiales entre Espéndez y su hijo y existiendo una orden prohibiendo que se sacara al niño de nuestra jurisdicción.
En dicha ciudad, Cabrera presentó una petición ante la corte civil del Condado de Queens en Nueva York, solicitando el cambio de nombre de su hijo y el suyo propio, alegando que siempre habían sido conocidos como "Melissa Martin" y su hijo como "Andrew David Martin". En dicho juramento señaló además, que no existía pleito pendiente alguno, ni reclamación, ni obligación alguna contra ella o su hijo. Para febrero de 1996 se le otorgó el cambio de nombre a ambos. Dicha gestión burló la gestión realizada por las autoridades estatales y federales nuestras para localizar a Cabrera.
Obtenido el cambio de nombre, Cabrera solicitó y obtuvo pasaportes como ciudadanos americanos para ella y el niño bajo los nuevos nombres antes indicados. Así pues, se mudó para Costa Rica con el menor en una provincia conocida como San Isidro Heredia, donde vivió por espacio de dos años.
En mayo de 1999, Cabrera regresó a Puerto Rico y se estableció con su hijo en Fajardo. Allí fue localizada mediante las gestiones realizadas por los abuelos paternos del menor. No obstante, no fue hasta abril de 2000 que el niño fue matriculado en una escuela, a lo que Cabrera señaló que le daba "home schooling" al menor, ya que no conseguía escuelas para éste.
No fue hasta el 28 de febrero de 2000, que Cabrera compareció ante el Tribunal con nueva representación legal, mediante una moción solicitando se dejase sin efecto la orden de arresto dictada y que se sustituyera la misma por una Orden de Mostrar Causa. Además, alegó que su incumplimiento con las órdenes obedecían a su temor porque el padre del niño secuestrara a su hijo. Solicitó también que se le concedieran los alimentos atrasados. No obstante, el Tribunal había autorizado al padre a dejar de pagar la pensión hasta tanto apareciera Cabrera.
Por su parte, el Tribunal dejó sin efecto la orden de arresto, le impuso una sanción económica de mil dólares ($1,000.00) y refirió el caso para nueva evaluación ante la ORF y el Departamento de la Familia.
En 19 de julio de 2000 Cabrera, solicitó y logró una segunda Orden de Protección Ex parte contra Espéndez.
En 20 de septiembre de 2000, el menor Renier Andrés fue removido de la custodia de su madre por el Departamento de la Familia, mediante un proceso judicial de Ley 342, conocida como la Ley para el Amparo de Menores en el Siglo 21. El menor fue colocado bajo la custodia física de sus abuelos paternos. Durante este tiempo, el menor tuvo la oportunidad de compartir con sus abuelos y de que se realizaran las correspondientes pruebas psicológicas a la madre y al menor. No obstante, el caso se cerró y el niño regresó con la madre.
En 20 de octubre de 2000, el Tribunal nombró como Defensor Judicial del menor a la Leda. Ana Luisa González. Tres días más tarde, la Trabajadora Social del Tribunal informó sobre el incumplimiento y la *863 negación de Cabrera hacia las órdenes del Tribunal al suspender dos citas pautadas para evaluación psicológica de ella y el menor.
Una vez analizados y evaluados los informes sociales rendidos, las evaluaciones psicológicas y escuchados los argumentos de las partes, en 9 de abril de 2001, el Tribunal le concedió la custodia provisional del menor a los abuelos paternos, Sr. Ernesto Espéndez Ruiz y Sra. Olga Sosa, para que se relacionara con su padre quien estaría en Puerto Rico hasta el 14 de abril de 2001.
Ante dicha Orden, Cabrera y su madre se abrazaron al menor sin soltarlo y requirió la intervención de varios alguaciles para desprender al niño y entregarlo al padre. Cabrera se tornó violenta y descontrolada, comenzó a proferir palabras soeces y hasta mordió a uno de los alguaciles en un brazo. Finalmente se le pudo entregar a los abuelos la custodia del menor.
En 10 de abril de 2001, Espéndez reiteró su solicitud de custodia del menor presentada en 23 de marzo del mismo año.
Mediante resolución y orden de 11 de abril de 2001, el foro de instancia concedió la custodia provisional a los abuelos paternos señalando vista para el 7 de mayo del mismo año.
Posteriormente, en 16 de mayo de 2001, el Tribunal de Primera Instancia concedió la custodia provisional a Espéndez, y lo autorizó a regresar al estado de Florida con el menor. Además, se prohibieron las relaciones materno-filiales y se le prohibió a Cabrera, comunicarse o intervenir de forma alguna con el niño.
Finalmente, luego de celebradas las vistas en su fondo, en 6 de abril de 2002, el foro apelado dictó Sentencia, notificada a las partes en 17 de mayo del mismo año, en la que el Tribunal otorgó la custodia del menor, Renier Andrés Espéndez Cabrera, al padre de éste, Renier Espéndez Sosa. Además, se le devolvió el derecho a la patria potestad sobre su hijo, sin limitación de clase alguna. El Tribunal prohibió las relaciones materno-filiales y con los miembros de la familia materna, hasta tanto se evidencie al Tribunal que Cabrera ha recibido la terapia necesaria que la faculte para demostrar actitudes y creencias a favor de la paternidad de Espéndez. Determinó, además, que la relación entre la madre y el niño procedería cuando los profesionales que traten al niño así lo recomienden. Se ordenó a la Sra. Cabrera que devolviera al Sr. Espéndez la cantidad de mil seiscientos setenta y tres dólares ($1,673.00) recibidos de ASUME y se ordenó a dicha agencia a cerrar la cuenta correspondiente con balance de cero (0) deuda.
Actualmente, el menor reside con su padre, en el estado de Florida, donde asiste a la escuela y recibe tratamiento psicológico.
Inconforme con dicha determinación, la Sra. Cabrera presentó su escrito de Apelación en la que señaló al foro de instancia la comisión de los siguientes errores:

“1. Erró el Tribunal de Primera Instancia al conceder la custodia permanente del hijo procreado entre las partes al demandado-apelado por haber sido una decisión contraria a derecho y por no estar sustentada por la totalidad de la prueba desfilada y ser producto de pasión, prejuicio y parcialidad.

2. Erró el Tribunal de Primera Instancia al prohibir totalmente las relaciones materno-filiales desde que se entregó la custodia provisional y luego permanente, al demandado apelado.
3. Erró el Tribunal de Instancia al determinar que el demandado-apelado no tiene que pagar la deuda por pensión alimentaria a la parte demandante y de la cual nunca se le relevó de cumplir. ” (Apelación págs. 5-6)
Por su parte, el apelado, Sr. Espéndez presentó su alegato en 5 de agosto de 2001.
*864 Finalmente, en 12 de agosto de 2003, las partes presentaron Exposición Narrativa de la Prueba.
De la Exposición Narrativa de la Prueba, surge que el testimonio de los peritos consistió en lo siguiente:

“A. Testimonio de la Trabajadora Social del Tribunal, María del C. Vega Agosto

Vega entrevistó a las partes como parte del proceso de custodia en varias ocasiones. Esta recomendó que el menor fuera removido temporeramente del hogar materno, para evaluar la situación en dos meses y que la madre de éste recibiera tratamiento psicológico o psiquiátrico. O sea, que el menor residiera temporeramente en casa del abuelo paterno y su esposa, por el bienestar del menor. Se recomendó además que se le apercibiera a Cabrera de no interferir con las personas a cargo del menor y no crear conflictos con ellos. Recomendó vistas de seguimiento y que los tratamientos psicológicos y psiquiátricos fueran informados al Tribunal.

En cuanto a la evaluación psicológica realizada por la Sra. Ortiz a la Sra. Cabrera, testificó que surgió que el menor estaba siendo presionado psicológicamente y que se trata de un caso de enajenación paterno-filial severa. Además, que la Sra. Ortiz percibió que Cabrera ve al niño como objeto y no reconoce que su actitud afecta al niño en su integridad personal. Recomendó la psiquiátra que el niño fuera removido a la casa de sus abuelos paternos temporeramente. Además, indicó que no existía forma alguna en que el Sr. Espéndez pudiese relacionarse con su-hijo ante el cuadro de enajenación paterna severa que presenta el menor.

No pudieron evaluar al niño porque éste se negaba a separarse de la madre y se alteraba. Posteriormente, el niño fue llevado a evaluación por su abuelo paterno.

Los abuelos paternos le inculcan buenos hábitos alimenticios y de higiene, cosa que no era inculcada por la madre. Además, lo llevaban a actividades sociales y se relacionaba muy bien con éstos.

Declaró que el presente caso se trata de uno de enajenación paterna severa debido a toda la información negativa sobre el padre que se la ha brindado al menor y que no era viable que Cabrera pudiera cooperar con unas relaciones patemo-filiales entre el menor y el padre. Entiende que la madre ha agotado todas sus energías en enajenar al niño de la figura del padre, pues el niño expresó que no quería al padre y que éste lo quería secuestrar. Al entrevistar el niño a solas, éste le indicó que el padre le quería hacer daño y que quería ayuda. No obstante, indicó que estuvo fuera de Puerto Rico sin brindar detalle alguno. Sin embargo, a la Psicólogo Ortiz se le dijo que nunca había vivido fuera de Puerto Rico.

En cuanto al padre del menor, éste expresó estar muy interesado en iniciar las relaciones paterno-filiales, cosa que nunca se le permitió cuando venía a Puerto Rico. Que quiere el bienestar de su hijo, relacionarse con él de manera efectiva, ya que nunca lo ha logrado porque la madre interrumpió esa relación. Le indicó el padre, que el menor fue sacado de Puerto Rico y se negaban a informarle dónde estaba. Además, que tanto la madre como el menor se habían cambiado los nombres.

En cuanto a la madre del menor, Myma Cabrera, testificó que ésta se negó a cooperar y a dar información en su entrevista. Sólo indicó que trabajaba en una escuela, pero que se encontraba desempleada. Sobre el cambio de nombres, ésta no brindó información alguna. Indicó que Cabrera le ha hecho manifestaciones obsesivas, y planteó persecución con ella y el niño, que el Sr. Espéndez se debía alejar de ellos.

Se entrevistó, además, al abuelo paterno, Ernesto Espéndez Ruiz y su esposa, Olga Rosa, quien le indicó sobre cómo el niño se relacionó por primera vez con su padre y que se han creado lazos de afecto entre ambos. Informó, además, que el niño lloraba cuando el padre se iba, pero que todo estaba muy bien.

*865
B. Testimonio de la abuela paterna del menor, Sra. Ada Sosa

Reside en el estado de la Florida desde hace aproximadamente veinte (20) años y es maestra. No había visto a su nieto antes de abril de 2002, pues no se le había permitido verlo. En la escuela donde ella labora, aceptan al niño y está dispuesta a cooperar con el proceso de custodia del menor, por el bienestar de éste. Que el niño tiene nueve (9) años y está en segundo grado, cuando debería estar en quinto, porque la madre no se preocupó por su educación y por ello refleja atrasos académicos.

C. Testimonio de la Psicóloga del Tribunal, Carmen Celia Ortiz Velázquez

Evaluó a las partes para el año 1995, cuando se fueron referidas para evaluación y luego en el 2001. Durante este tiempo no se dieron las relaciones patemo-filiales, ya que la madre y el niño habían desaparecido.

Para el 1995, ésta encontró que Cabrera tenía un miedo irracional a su ex-esposo, y evitaba que el niño y su padre tuvieran una relación sana. Que sometió al niño a experiencias peligrosas y amenazantes.

En la evaluación del niño, éste se mostró depresivo, introvertido y sometido a una presión psicológica. Desarrolló y manifestó hostilidad y odio al padre. Además, no presentó un afecto positivo hacia la figura paterna y sus familiares. El niño manifestó que su padre maltrataba a su madre, que le mostraron documentos y fotos de esto. Al entrevistarlo en presencia de la madre, se hacía difícil, pues el niño se agarraba de su madre y no quería soltarse para entrevistarlo a solas. Una vez logró entrevistarlo a solas, lo encontró tenso, hostil y luego bajó un poco su conducta, según discurría la entrevista. En ausencia de la madre, el niño dio un cambio significativo en la entrevista.

El niño le manifestó su temor en cuanto a la remoción de la cual había sido objeto en días pasados, que fue llevado a casa de su abuelo, a una "casa fea, llena de polvo y telarañas". Negó haber vivido fuera de Puerto Rico y que su único padre era "abuelo Jerry". 

En una de las entrevistas en el 1995, se le realizaron unas pruebas psicológicas y el resultado arrojó que estaba incapacitada para tener el niño.

En cuanto a Cabrera, la psicóloga indicó que ésta padece de una condición llamada Enajenación Paterna Severa. Que dicha condición hace que ésta vea al padre como un enemigo que quiere hacerle daño. Al ser evaluada en 8 de enero de 2001, ésta seguía con su miedo irracional, estaba sobrecargada de presiones. Ésta además, ve al niño como un objeto, y habla mal de éste.

Testificó además que se había enterado del desacato civil contra Cabrera por no haber comparecido ante el Tribunal y que ésta se había ido de Puerto Rico y se había cambiado el nombre y el del niño.

Al entrevistar al padre del menor en 19 de octubre de 2000, halló una persona introvertida y sobrecargada. Que no veía a su hijo desde el 1995, ya que la madre lo desapareció por espacio de cinco años. Que la madre se había ido para Costa Rica por problemas con la justicia en Puerto Rico.

En cuanto a sus recomendaciones, declaró y reiteró que Cabrera padecía de una enajenación paterno severa y si no se removía al niño de su lado, éste nunca podría relacionarse efectivamente con su padre. Esta situación le ha creado un daño severo al niño, por lo que éste se beneficiaría con unas relaciones patemo-filiales estables y efectivas, ya que el padre está capacitado para ello.

Finalmente, expresó que no podría contestar si la Sra. Cabrera podría superar su condición de 
*866
enajenación paterna si se le brinda tratamiento mientras se quede con el niño y se establezcan relaciones paterno-filiales. En cuanto al padre del niño manifestó que es una persona inteligente, que no se le ha permitido relacionarse efectivamente con su hijo y que negó en todo momento haber maltratado a Cabrera. ■

D. Testimonio del Psicólogo José Luis Ortega Cuesta

Entrevistó al niño, una vez éste fue referido para evaluación por recomendación de su escuela en cuanto al aspecto educativo. Que se le solicitó realizar un informe para ayudar el niño y a la familia de éste.

Sus hallazgos fueron que el niño es uno promedio y sobre promedio en el área verbal. Que tiene dificultades en lectura, problemas del habla, dificultad neurológica que podría causar retraso en el proceso educativo.

Al momento de la evaluación realizó unas recomendaciones para aquel momento en particular, pero que ahora tendría que reevaluar la situación. En aquel momento, recomendó que devolvieran al menor a la madre y se establecieran relaciones paterno-filiales claras, precisas y duraderas debido a que eran necesarias y convenientes. No obstante, Cabrera mostraba resistencia a dicha recomendación, toda vez que no estaba de acuerdo con las relaciones paterno-filiales.

Entrevistó al menor en varias ocasiones, quien denotó estar feliz y contento por haber conocido a su padre y abuelos paternos. Antes no conocía a su padre y hacía comentarios poco organizados de reparo a conocerlos.

A la señora Cabrera, la entrevistó por teléfono; no obstante, se cortaron las vías de comunicación con él por el pobre enfoque sobre manejo del niño que presentaba la madre.

Indicó además que el niño tenía una deficiencia de un año por debajo de su edad y que la figura paterna era muy importante para el menor.

Sobre el padre del menor, testificó que le habían dicho que éste era agresivo y conflictivo, pero que dicha información no era correcta. Que éste era tranquilo y no era agresivo. Dicha imagen negativa que el menor tenía sobre su padre era inculcado por las personas que vivían con el.

No obstante, el niño denotó tener una relación excelente con el abuelo y el padre y tenía miedo de que no le dejaran ver de nuevo al padre y al abuelo paterno.

E. Testimonio de la esposa del abuelo materno, Olga Rosa de Espéndez

Que el niño está bajo su custodia y de la del abuelo paterno. La experiencia con el menor ha sido excelente desde el primer día. Que el niño es amoroso, simpático, amable, cariñoso y la llama Princesa. Se lleva muy bien con toda la familia. A principio denotó cierta resistencia y se denotaba temeroso. El niño le contó que a él le dijeron que ellos eran malos y que lo iban a desaparecer por parte de su mamá. Testificó además que la relación del padre con el niño era extraordinaria y que cuando éste se va, llora desconsoladamente pues no quiere que se vaya. El niño está contento y feliz con toda su familia paterna y la relación con ellos es muy buena. La madre del menor no ve ni llama al niño y que la intención no es quitarle la custodia a la promovida.

F. Testimonio del padre del menor, Reinier Espéndez Sosa

Reside en el estado de la Florida, es casado y reside con su esposa, Alma Linette Espinal con quien procreó otro hijo. A su hijo, Reinier, lo vio recién nacido un par de días mientras estuvo en Puerto Rico y luego la madre le permitió verlo y lo desapareció desde el 1995 al 2000, mientras se estaba viendo el caso en el 
*867
Tribunal y existiendo una orden del Tribunal de Primera Instancia prohibiendo sacar al niño de nuestra jurisdicción. La madre sacó el niño del país sin autorización y por dicha razón ser ordenó su arresto. Realizó varias gestiones para relacionarse con su hijo y averiguar su paradero, pero le fue inútil.

Testificó que Cabrera había sacado unos pasaportes con nombres distintos, pues se cambió el nombre y también al niño y se fueron hacia América del Sur. Obtuvo una resolución del estado de Nueva York donde Cabrera se cambió el nombre y el del menor sin autorización y mediante engaño al Tribunal de dicho estado.

Por otro lado expuso que nunca había maltratado a su ex-esposa, pero que a pesar de ello fue acusado por Ley 54 y el caso no prosperó, pues el mismo padre de Cabrera testificó a favor de él negando las alegaciones de ésta. Que el maltratado era él.

Está solicitando la custodia del menor por su bienestar y salud, para que el niño sea feliz y normal. Mostró además dos videos, los cuales evidencian la buena relación entre la familia paterna y el niño.

Indicó además que no puede deber la cantidad de $11,800.00 en pensiones atrasadas, según al Administración para el Sustento de Menores, porque el Juez le ordenó dejar de pagar, hasta tanto la madre del menor apareciera.

G. Testimonio de la aquí apelante, Myrna Cabrera Soto

Declaró que reside junto a su madre en la Urbanización Santa Juana de Caguas y es madre del menor de nueve años. Tiene un bachillerato en Educación y es maestra autorizada a ejercer en Puerto Rico.

Que su niño es inteligente, sano y muy conversador, se lleva bien con su abuela y familia materna. Estaba estudiando en un colegio privado y ella costeaba dicho gasto. El padre nunca le pagó alimentos a su hijo.

Que es la única persona que entiende y conoce al niño, pues es su madre y está preparada para la crianza y educación de su hijo.

Luego que el niño nació, el padre lo vio dos veces y luego no lo procuró más. Ella promovió el divorcio por trato cruel, pero se divorciaron por consentimiento mutuo, pues el padre accedió a concederle la custodia y la patria potestad del niño.

Se tuvo que ir de Puerto Rico por temor al padre del niño quien siempre fue una persona maltratante, y para que el niño no se pudiera relacionar con su padre. No obstante, aceptó que lo anterior no era cierto ni correcto, sino que eso era lo que ella pensaba y decía.

Que evadió la jurisdicción cuando sabía que había una orden de arresto contra ella y que no debía sacar al niño de Puerto Rico. Se fue a vivir a la ciudad de Nueva York, donde compareció ante un Tribunal solicitando cambiar el nombre de ella y de su hijo, por el de Melissa Martín y Andrew David Martín. Aceptó además que en la petición juramentada indicó no tener conocimiento del paradero del padre del menor, que no había pleito pendiente con relación a ello y otros detalles que resultaron ser falsos. O sea, que mintió al Tribunal de Nueva York, ya que en la solicitud de cambio de nombre puso información que le constaba que no era cierta.

De Nueva York se trasladó a Costa Rica, huyendo del padre quien la había amenazado con quitarle al niño y secuestrarlo. Su niño siempre estuvo bien de salud y ella velaba constantemente por su bienestar. En Costa Rica estaba en la escuela donde cursó el kindergarten y parte del primer grado, el cual no completó por problemas de aprendizaje. Que el menor se atrasó porque se mudó de Puerto Rico a Nueva York, de Nueva 
*868
York a Costa Rica y de Costa Rica a Puerto Rico, en el 1999. En Puerto Rico, el niño fue matriculado en un colegio privado, luego de darle "home schooling", ya que no conseguía escuelas para su hijo. No obstante, en el Departamento de Educación no le aprobaron este tipo de educación al menor.

Regresó a Puerto Rico a enfrentar la realidad de que tenía una orden de arresto en su contra por desacato en el caso de divorcio y extrañaba su tierra y sus familiares. Que vino voluntariamente y fue al Tribunal y se entregó; pagó una sanción económica y solicitó que se le ordenara al padre del menor pagar el dinero en concepto de pensión alimentaria atrasada desde que el niño nació.

Que el padre del menor compareció al Tribunal porque fue ella quien movió la Corte para que él compareciera a mostrar causa, y a pesar de ello, ella terminó perjudicada, pues le removieron al niño en dos ocasiones.

Se le prohíbe ver al niño por orden del Tribunal de manera injusta, pues no hay nada que pueda establecer que ella no está capacitada para tener a su hijo. Que nunca ha sido acusada de madre maltratante y no se explica porqué le quitaron la custodia. Indicó además que posee los recursos físicos y económicos para criar y educar al niño adecuadamente y que con el padre es todo lo contrario, pues es un hombre que nunca le ofreció cariño al niño, nunca lo buscó ni se ocupó de él.

Aceptó haber desobedecido las órdenes del Tribunal a sabiendas de que no podía hacerlo. Que se dictaron órdenes para que se efectuaran relaciones paterno filiales, pero que ella no las permitía, por alegado maltrato por parte de Espéndez.

Testificó a cerca de lo sucedido en 9 de abril de 2001, cuando se le ordenó entregar el menor al padre y a los abuelos paternos para que se relacionaran y ésta se negó a entregarlo, creando una situación violenta cuando los alguaciles intervinieron con ella, tuvieron que someterla a la obediencia, se formó un forcejeo y hasta mordió a uno de los alguaciles.

Entregó los pasaportes con cambio de nombre al Tribunal y admitió haber hecho varias llamadas e intervenciones con la Policía del estado de Florida querellándose de que habían secuestrado el niño, cuando sabía que el Tribunal había autorizado al padre a sacar al niño de nuestra jurisdicción a Florida.

Aceptó además que el Tribunal le había ordenado comparecer a oficinas de Trabajadores Sociales y que ella no iba, que no permitía que entrevistaran al niño adecuadamente porque no lo podían obligar. Que hizo esto a pesar de que se le ordenó permitir las entrevistas y consultas. Se entrevistó con las Trabajadoras Sociales, pero no cooperó con ellas, ni con lo ordenado por el Tribunal porque ella entendía que no era necesario, pues estaba bien y no necesitaba ayuda.

H. Derecho Aplicable y Análisis
i.
El apelante señala que erró el Tribunal al conceder la custodia permanente del menor al demandado apelado, por haber sido una decisión contraria a derecho y por no estar sustentada por la totalidad de la prueba desfilada y ser producto de pasión, prejuicio y parcialidad.
Es norma fundamental en el proceso apelativo el que la apreciación de la prueba realizada por el tribunal sentenciador debe ser objeto de gran deferencia y que no se debe intervenir con la apreciación de la prueba reflejada en las determinaciones de hechos del tribunal apelado en ausencia de circunstancias extraordinarias, o que se demuestre que éste actuó movido por la pasión, el prejuicio, parcialidad, o error manifiesto. Monitor Arzola v. Soc. Legal de Gananciales, 138 D.P.R. 600 (1995); Pérez Cruz v. Hosp. La Concepción, 115 D.P.R. *869 721 (1984). A menos que la apreciación de la evidencia se aleje de la realidad fáctica o que la prueba sea inherentemente imposible o increíble, debemos abstenemos de intervenir con la apreciación de la pmeba hecha por el foro recurrido. Pueblo v. Rivero Diodonet, 121 D.P.R. 454 (1988).
Un foro apelativo no puede descartar y sustituir por sus propias apreciaciones, basadas en un examen del expediente del caso, las determinaciones tajantes y ponderadas dél foro de instancia. Argüello López v. Argüello García, 154 D.P.R. _ (2001), 2001 J.T.S. 127. Sabido es que el juzgador de los hechos, que oyó y vio declarar a los testigos y apreció su demeanor, es quien está indudablemente en la mejor posición para aquilatar la prueba testifical desfilada. López Vicil v. ITT Intermedia, Inc., 142 D.P.R. 857 (1997) (resolución); Ortiz v. Cruz Pabón, 103 D.P.R. 939 (1975).
De hecho, la Regla 43.2 de Procedimiento Civil, 32 L.P.R.A. Ap. Ill, R. 43.2, en lo pertinente, dispone que:

“...las determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos... ”.

Un tribunal apelativo no puede dejar sin efecto una sentencia cuyas conclusiones encuentran apoyo en la pmeba desfilada. Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172, 181 (1985); Pérez v. Hospital La Concepción, 115 D.P.R. 721, 728 (1984). No obstante, está claro que el arbitrio del juzgador de hechos es respetable, mas no absoluto. Por eso, una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de un tribunal apelativo. Véase, Vélez v. Srio. de Justicia, 115 D.P.R. 533, 545 (1984).
Contrario a lo que plantea Cabrera, de la totalidad del expediente no surgen circunstancias de error manifiesto que justifiquen la intervención de este Tribunal con la credibilidad dirimida por el Tribunal apelado y la deferencia que a esos efectos se le debe a éste. Véase, Pérez v. Col. Cirujanos Dentistas de P.R., 131 D.P.R. 545, 562 (1992). Más allá de las meras alegaciones de la apelante, ésta no nos pone en condiciones de intervenir con las determinaciones de hechos, la apreciación de la pmeba y las adjudicaciones de credibilidaid realizadas por el Tribunal apelado. Según ha sido resuelto por el Tribunal Supremo de Puerto Rico, un foro apelativo no puede descartar y sustituir por sus propias apreciaciones basadas en un examen del expediente del caso, las determinaciones, como en este caso, tajantes y ponderadas del foro de instancia. Rolón García y otros v. Charlie Car Rental, Inc., 148 D.P.R. 420 (1999).
En este caso, lo determinante es lo que constituye el mejor bienestar del menor. O sea, el factor clave es si el bienestar y la estabilidad emocional del niño, se beneficia bajo la custodia de su padre o de su madre, la aquí apelante.
ii.
Por años, nuestro más alto Tribunal ha reiterado que los casos de menores, donde está involucrado el bienestar de éstos, están revestidos del más alto interés público, suficiente para justificar la intervención del Estado en el ejercicio de su poder de parens patrie.
El Artículo 107 del Código Civil de Puerto Rico, 31 LPRA see. 383, según enmendado, dispone que en todos los casos de divorcio los hijos serán puestos bajo el cuido y la patria potestad del cónyuge que el Tribunal, en el ejercicio de su sana discreción, considere que los mejores intereses y bienestar del menor queden mejor servidos. Establece, además, que "El cónyuge que haya sido privado de la custodia y la patria potestad tendrá derecho a recobrarlos si acreditase ante cualquier sala competente del Tribunal de Primera Instancia ... a satisfacción del Tribunal que a los mejores intereses y bienestar de los menores conviene la referida recuperación de custodia y patria potestad."
*870 Por otro lado, la custodia es el núcleo alrededor del cual gravitan y son ordenadas las demás prerrogativas paternas y maternas. La misma también es un atributo inherente de la patria potestad porque impone a los padres el deber primario de tener a sus hijos no emancipados en su compañía, Ex Parte Torres, 118 D.P.R. 469, 476 (1987). Después de todo, no debemos olvidar que la asociación de los hijos con sus padres, al mismo tiempo que reconoce el derecho de éstos a disfrutar de su compañía, desarrolla en los niños el afecto a los autores de sus días y contribuye a formar sus corazones en un ambiente de fraternidad paternal, Sterzinger v. Ramírez, 116 D.P.R. 762, 775 (1985); Picó v. Mejía, 52 D.P.R. 728, 731 (1938).
Al dilucidar controversias relacionadas a la custodia, los tribunales deben ser guiados por el criterio del bienestar y mejor interés del menor. El concepto “bienestar del menor” incluye diversos factores de orden moral, psíquico, cultural y económico, Rodríguez v. Torres, 80 D.P.R. 778, 780 (1958). Por ello, para determinar qué tipo de decreto puede redundar en el mejor interés del menor, los tribunales deben considerar los siguientes factores: (a) la preferencia del menor, su sexo, edad y salud mental y física; (b) el cariño que pueda ser brindado por las partes en controversia; (c) la habilidad de las partes para satisfacer debidamente las necesidades afectivas, morales y económicas del menor; (d) el grado de ajuste del menor al hogar, la escuela y la comunidad en que vive; (e) la interrelación del menor con las partes, sus hermanos y otros miembros de la familia; y (f) la salud psíquica de todas las partes. Ningún factor es de por sí decisivo, pero hay que sopesarlos todos para juzgar de qué lado es inclinada la balanza y, al menos, poder alcanzar la solución más justa en un asunto de tan extrema dificultad, Sánchez Cruz v. Torres Figueroa, 123 D.P.R. 418, 431 (1989); Perrón v. Corretjer, 113 D.P.R. 593, 606 (1982); Nudelman v. Ferrer Bolívar, 107 D.P.R. 495, 511-512 (1978); Marrero Reyes v. García Ramírez, 105 D.P.R. 90, 104-106 (1976).
Estos criterios antes mencionados son las guías que, con el apoyo de las opiniones periciales, llevarán al juzgador a tomar una decisión sobre la custodia de un menor.
No obstante, "la misión del Tribunal en el ejercicio del poder de parens patriae del Estado es determinar a quién corresponde la custodia de los hijos menores, guiado primordialmente por el bienestar y conveniencia de éstos", Castro v. Meléndez, 82 D.P.R. 573, 576-577 (1961).
El Tribunal, correctamente, realizó un análisis de cada uno de los criterios establecidos por el Tribunal Supremo para determinar a quién otorgarle la custodia de la menor. La mayoría de los criterios analizados se inclinaban hacia el padre, Sr. Espéndez, ya que éste reúne las cualidades idóneas que representan el mejor bienestar de la menor. Además, las recomendaciones de los peritos se inclinaban a favor del padre, pues es junto a éste que el niño goza de bienestar y estabilidad emocional. Más aún, el testimonio pericial demostró que la madre del menor requiere ayuda psicológica o psiquiátrica y ésta no ha procurado dicha ayuda.
Si bien es cierto que, inicialmente, el menor tenía una fuerte predilección en cuanto a quedarse con su madre y que manifestaba temor a su padre y a la familia paterna, para esa fecha, el niño no conocía a su padre, no había compartido con él y todo lo que conocía sobre éste era lo que su madre le había manifestado. Actualmente, la situación es otra. La prueba desfilada demostró que el niño prefiere permanecer con su padre en Florida y su temor es que su madre lo encuentre y lo devuelva a su vida anterior.
Al así determinar, el foro apelado no incidió. Surge del expediente en su totalidad que la persona idónea para ostentar la custodia del menor, Renier Espéndez Cabrera, es su padre, aquí apelado, Renier Espéndez Sosa.
iii.
Aduce la apelante que el tribunal a quo erró al suspender las relaciones matemo-filiales entre ésta y su hijo, ya que las mismas están protegidas por el derecho a la libertad constitucionalmente garantizado.
Ciertamente, nuestro más alto foro judicial ha resuelto que las relaciones materno o patemo-fihales han de *871 ser protegidas si existe la posibilidad de que el menor regrese al hogar biológico o natural. De otra parte ha autorizado la prohibición de las mismas cuando existen circunstancias y causas graves que así lo ameriten. Hidalgo v. Depto. de Servicios Sociales, 129 D.P.R. 605 (1991); Sterzinger v. Ramírez, 116 D.P.R. 762 (1985). Así pues, el maltrato constante en un hogar, que pone en riesgo la seguridad e integridad de todos sus integrantes, es una situación grave que milita en contra, y es superior a cualquier derecho constitucional que tengan los padres a favor suyo en relación con sus hijos.
Surge con meridiana claridad que en el caso de autos, el menor Reinier Espéndez Cabrera ha sido sometido a un patrón de maltrato por parte de su madre, infundiéndole grave daño psicológico y emocional al menor. Además, el testimonio pericial demostró que es necesario que la Sra. Cabrera sea sometida a terapias individuales y sin esas terapias no puede recomendarse que el niño regrese al hogar materno. En aras del mejor bienestar del menor, y de garantizar el mismo, la medida apropiada es la tomada por el Tribunal de Primera Instancia de privar las relaciones matemo-filiales.
iv.
Finalmente, nos señala la apelante que procede el pago por concepto de pensión alimentaria adeudada por la cantidad de once mil doscientos dólares ($11,200.00) por el tiempo en que ella desapareció de Puerto Rico, independientemente de que hubiese evadido la jurisdicción. Además, que la cantidad de mil seiscientos setenta y tres dólares ($1,673.00) que le había sido entregada por ASUME, no debía ser devuelta a Espéndez, tal y como fuera ordenado por el Tribunal.
La pensión alimentaria a beneficio del menor fue fijada en doscientos dólares ($200.00) a partir del 1ro. de marzo de 1993. El padre realizó algunos de los pagos hasta que la Sra. Cabrera desapareció con su hijo por espacio de cinco (5) años. Para el 17 de noviembre de 1995, el Tribunal estableció que los pagos de la pensión se realizarían a través de ASUME.
Al regresar a Puerto Rico con su hijo, Espéndez reconoció la existencia de una deuda por la cantidad de tres mil novecientos ochenta dólares ($3,980.00) hasta el año 1995; realizó un pago por dos mil dólares ($2,000.00), quedando un remanente de mil novecientos ochenta dólares ($1,980.00). Por lo tanto, quedó sin pagar el remanente mencionado y los años en que Cabrera estuvo fuera de Puerto Rico.
Por otro lado, a Espéndez se le retuvo la cantidad de mil seiscientos setenta y tres dólares ($1,673.00) por concepto de reintegro contributivo del año 2000, por lo cual, el Tribunal de Primera Instancia ordenó a ASUME que le devolviera dicha suma; sin embargo, dicha agencia ya los había remitido a Cabrera. Lo anterior, debido a que el menor se encontraba con su padre, por lo que la madre se apropió de dicha suma sin tener derecho a ello.
Comenzamos por señalar que la Ley Orgánica de la Administración para el Sustento de Menores (ASUME) expresa que sus disposiciones se interpretarán liberalmente a favor de los mejores intereses del menor. 8 L.P.R. A. See. 502. Es de conocimiento general que la frase "mejores intereses del menor" tiene un significado elevado, ya que envuelve un interés apremiante del Estado. Nuestro más alto foro ha expresado que los casos relacionados con alimentos de menores están revestidos del más alto interés público. Negrón Rivera, Ex Parte, 120 D.P.R. 61 (1987). Nuestra legislación es clara al expresar que la obligación de alimentos está fundamentada en el derecho a la vida, revestido del más alto interés público y reconocido por el Código Civil. Ley Orgánica de ASUME, supra.
Se entiende por alimentos todo lo que es indispensable para el sustento, habitación, vestido y asistencia médica, según la posición social de la familia. Los alimentos comprenden también la educación e instrucción del alimentista, cuando es menor de edad. 31 L.P.R.A. 561. Dicho de otro modo, los alimentos corresponden a las necesidades básicas de los alimentistas y la razón de ser de las pensiones alimentarias, predicadas a la necesidad del alimentista, pierde su eficacia luego de pasar un largo número de años. Rodríguez Aviles v. *872 Rodríguez Besujf, 117 D.P.R. 616 (1986).
Tal y como quedó demostrado, Cabrera huyó de nuestra Isla hacia el estado de Florida, en contravención con las órdenes del Tribunal de Primera Instancia, evadiendo nuestra jurisdicción, y cambió su identidad y la del menor mediante engaño a las autoridades estatales y federales concernientes. Con dicha actuación, Cabrera negó a su hijo los alimentos fijados.
Sabido es que los padres con patria potestad y custodia tienen el deber de reclamar a tiempo los alimentos para los menores. A los efectos, nuestro Tribunal Supremo resolvió:
“En fecha reciente hemos reiterado la obligación de los tribunales de instancia de ser "fuertes y rigurosos en lograr que [los] padres cumplan con su deber [alimenticio]", Valencia, Ex parte, 116 D.P.R. 909, 912 (1986), y de que los procedimientos de alimentos se tramiten rápidamente, Martínez v. Rivera Hernández, 116 D.P.R. 164 (1985); Quiñones v. Jiménez Conde, 117 D.P.R. 1 (1986.). Sin embargo, debemos reafirmar, además, el deber que tiene el padre con la patria potestad y custodia de reclamar los alimentos a tiempo. La razón de ser de las pensiones alimenticias, predicadas en la necesidad del alimentista, pierde su eficacia luego de pasar un largo número de años. B. Piñar López, La prestación alimenticia en nuestro derecho civil, 199 Rev. Gen. Le gis. Jur. 7, 12 (1955).”
Coincidimos con la determinación del foro apelado; es "...insostenible que la Sra. Cabrera reclame un derecho a favor de su hijo que ella misma renunció en su día, en perjuicio de él." Aunque reconocemos que los alimentos de menores no se pueden renunciar, en las circunstancias particulares del presente caso entendemos que la madre los consideró innecesarios. (Resolución pág. 17) De la misma manera, la cantidad de mil seiscientos setenta y tres dólares ($1,673.00), erróneamente remitida a la Sra. Cabrera por ASUME, por concepto de retenciones hechas al Sr. Espéndez no procede, pues no existía deuda a favor de la apelante, por lo tanto, procede la devolución de dicha suma de dinero. Siendo ello así, tampoco cometió error el .Tribunal de Primera Instancia al así determinar.
Por todo lo antes expuesto, se CONFIRMA la determinación del Tribunal de Primera Instancia en su totalidad.
Notifíquese.
Lo acordó y manda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 2004 DTA 29
1. Surge de la exposición narrativa de la prueba que el Sr. Espéndez se encuentra casado con la Sra. Alma Linette Espinal con quien procreó otro hijo. No tenemos conocimiento si la situación actual es o no diferente.
2. Esta declaración resultó falsa, toda vez que se demostró que el niño vivió fuera de Puerto Rico.
3. Dra. Ruth E. Ortega-Vélez, 25 Lecciones de Derecho de Familia, San Juan, Puerto Rico, Ediciones Scisco, 1997, página 266.